THOMAS E. NUNN, APPELLEE, V. TEXACO TRADING AND TRANSPORTATION, INC., APPELLANT.

523 N.W.2d 705

Filed November 1, 1994.   No. A-94-083.

Paul F. Prentiss, of Timmermier, Gross & Burns, for appellant.

Robert W. Mullin, of Van Steenberg, Chaloupka, Mullin, Holyoke, Pahlke, Smith, Snyder & Hofmeister, P.C., for appellee.

CONNOLLY, IRWIN, and MILLER-LERMAN, Judges.

IRWIN, Judge.

Texaco Trading and Transportation, Inc., appeals from a decision of the review panel of the Workers' Compensation Court, which affirmed the trial court's award of benefits to Texaco's former employee, Thomas E. Nunn. Texaco claims that the review panel erred in affirming the trial court's determination that an accident in which Nunn was injured arose out of Nunn's employment with Texaco and in finding that Texaco was not entitled to credit in the award for payments it had made to Nunn through a short-term disability plan. We find no error in the lower court's determination that Nunn's accident arose out of his employment with Texaco and that Texaco was not entitled to credit for disability payments, and we therefore affirm the review panel's decision.

## FACTUAL BACKGROUND

Texaco hired Nunn as a crude oil truckdriver in 1988. On July 3, 1991, the date of the accident, Nunn was hauling crude oil from fields and depots in western Nebraska and eastern Wyoming to refineries in that region. Nunn was operating a semi-tractor with an attached crude oil tank and a "pup" tank trailer. That morning, Texaco dispatched Nunn from Kimball, Nebraska, to the "Sioux Depot Oil Lease" near Sidney, Nebraska. He arrived at the Sioux Depot Lease at

approximately 7:30 a.m., filled the truck tank and pup trailer with crude oil, and then drove to the Frontier Refinery in Cheyenne, Wyoming, to unload the oil. After he unloaded at the refinery, Nunn was dispatched to the "Quealy Dome Oil Lease," an oilfield near Laramie, Wyoming, to pick up another load of oil.

The oil that Nunn was to load at the Quealy Dome Lease was "sour crude," which meant that the oil had a high sulfur content and emitted hydrogen sulfide ($H_2S$) gas. According to testimony at the trial hearing, exposure to high concentrations of $H_2S$ can cause loss of consciousness and even death. For that reason, Texaco equipped its drivers, including Nunn, with personal monitoring devices that were to warn them when concentrations of $H_2S$ approached a level that posed a health risk.

When Nunn arrived at the Quealy Dome Lease, he noticed a sign warning of $H_2S$ gas, and he faced his truck into the wind so that he would not inhale the gas as the oil was being pumped into the tanks on his truck. Although Nunn's $H_2S$ monitor did not go off at any time while he was at the Quealy Dome Lease, he began feeling stomach pains as the oil was being pumped into the tanks. After filling the tanks and starting down the road to Cheyenne, Nunn's stomach pains subsided. When Nunn was approximately 25 miles west of Cheyenne on Interstate 80, he began descending a long, steep hill known as Sherman Hill. As he was descending Sherman Hill, he felt a heavy feeling in his stomach, which he described as like "swallow[ing] a brick or bread dough." As he approached a bridge spanning some railroad tracks, Nunn suddenly felt lightheaded, and before he could do more than remove his foot from the throttle, he blacked out. Nunn's truck then traveled off the roadway preceding the bridge, struck a guardrail, rolled onto the passenger's side, and skidded to a stop on the bridge. The pup trailer became unattached and fell from the bridge onto the railroad tracks. Oil spilled from the tanker truck and the pup trailer, and caught fire.

When Nunn regained consciousness, he was hanging by his seatbelt inside the truck cab. He noticed that the engine was still running, and as he reached to shut it off, flames emerged

around the passenger's-side corner of the windshield. He immediately released his seatbelt, and as he stood up inside the cab, the flames engulfed the entire exterior of the cab. Nunn then climbed up through the driver's side window and jumped from the truck, sustaining burns as he did so. He then ran away from the truck and was picked up by some passers-by, who drove him away from the accident scene.

Nunn was treated by emergency personnel near the scene and then transported by helicopter to the North Colorado Medical Center in Greeley, Colorado. He was diagnosed with first, second, and third degree burns of the face, neck, arms, back, buttocks, and hands, covering 25 to 28 percent of his total body surface area. Nunn was also diagnosed with psychological trauma resulting from the accident. He was treated at the hospital's burn center until July 27, 1991, and thereafter he received outpatient physical therapy at the Regional West Medical Center in Scottsbluff, Nebraska.

At the time of the accident, Nunn was covered by a short-term disability plan that was both administered and funded by Texaco. Pursuant to the plan, Texaco paid Nunn a total of $14,327 during the year following the accident. Texaco also paid a portion of Nunn's medical bills, in the amount of $34,457. However, Texaco did not pay workers' compensation disability benefits to Nunn.

In February 1993, Nunn obtained a vocational assessment and rehabilitation plan from Centennial Rehabilitation Associates, Inc. A report from Centennial contained in the record indicates that as a result of his injuries, Nunn was precluded from working in occupations that he had previously been engaged in. Nunn's vocational rehabilitation goal was to become a registered nurse.

Nunn filed a petition in the Workers' Compensation Court, and in an amended answer, Texaco denied that Nunn's injuries arose out of his employment. Texaco also alleged that it had paid certain "other benefits" to Nunn and claimed reimbursement for the medical expenses that it had paid on Nunn's behalf.

A hearing was held before a single judge of the Workers' Compensation Court on March 23, 1993. Among the exhibits

presented at the hearing was a letter from Dr. Louis W. Burgher to Texaco's counsel. In the letter, Dr. Burgher states that after he reviewed Nunn's medical records, he found nothing to support the theory that Nunn suffered from $H_2S$ overexposure. In its brief, Texaco also claims that a Dr. Weber concluded that Nunn passed out at the wheel due to the flu. We note that Texaco cites exhibit 29 in support of this statement. Exhibit 29 is a document entitled "perusal of records" and dated February 6, 1992. The document states that Nunn "[m]ost likely" suffered from vasovagal dizziness because of the flu. The document bears an illegible signature with a handwritten date below it of March 22, 1993, over 1 year later than the date at the top of the document. There is nothing in the record indicating what this document is supposed to be, whose signature is on the document, and in what capacity he or she signed the document. We recognize that the Workers' Compensation Court is not bound by rules of evidence or technical and formal rules of procedure. However, we remind counsel that we are not clairvoyant and that such exhibits are of limited value on appeal. After the accident, Nunn reported that he had felt flulike symptoms before he had blacked out and that he believed he had contracted the flu because his mother had been sick from the flu on the day before the accident.

On May 3, the single judge found that Nunn's injuries resulted from an accident which arose out of and in the course of his employment with Texaco and that as a result of such injuries, Nunn was temporarily and totally disabled from July 4, 1991, through September 3, 1992. The single judge found that Nunn thereafter sustained a 10-percent permanent loss of earning capacity and that he was entitled to vocational rehabilitation benefits as set forth in the rehabilitation plan developed by Centennial.

The court specifically rejected Texaco's claim that Nunn's accident did not arise out of his employment, stating that under the "positional risk" test, Nunn satisfied the "arising out of" requirement because he was required by his employment to be in a place of danger at the time that the accident occurred. The court also rejected Texaco's claim for credit for short-term disability benefits that it had paid to Nunn because the court

found that Texaco had denied liability for Nunn's injury.

Texaco filed an application for review, claiming that the trial court erred in adopting the positional risk doctrine and in failing to award credit to Texaco for short-term disability payments. The review panel affirmed the trial court's order, and Texaco thereafter timely appealed to this court.

## ASSIGNMENTS OF ERROR

Texaco claims that the review panel erred in affirming the trial court's determinations that (1) the accident arose out of Nunn's employment and (2) Texaco was not entitled to credit in the award for benefits paid to Nunn under its short-term disability plan.

## STANDARD OF REVIEW

The review panel of the Workers' Compensation Court sits as an appellate court when reviewing an award of the trial judge. Neb. Rev. Stat. § 48-179 (Reissue 1993). As such, the review panel may reverse or modify the findings, order, award, or judgment of the trial court only on the grounds that the judge was clearly wrong on the evidence or the decision was contrary to law. *Id.*

When a judgment of the review panel is appealed to a higher appellate court, such judgment has the same force and effect as a jury verdict in a civil case. Neb. Rev. Stat. § 48-185 (Reissue 1993). The higher appellate court may modify, reverse, or set aside the review panel's judgment on the grounds that (1) it acted without or in excess of its powers; (2) the judgment, order, or award was procured by fraud; (3) there was not sufficient evidence in the record to warrant the making of the order, judgment, or award; or (4) the findings of fact do not support the order or award. *Id.* See *Pearson v. Lincoln Telephone Co.*, 2 Neb. App. 703, 513 N.W.2d 361 (1994).

## DISCUSSION

*Arising Out of Employment.*

In order for an employee to recover benefits under the Nebraska Workers' Compensation Act, the employee must first prove that the accident giving rise to the injuries arose out of and in the course of his or her employment. Neb. Rev. Stat.

§ 48-101 (Reissue 1993). The term "accident" is defined in the Workers' Compensation Act as "an unexpected or unforeseen injury happening suddenly and violently, with or without human fault, and producing at the time objective symptoms of an injury." Neb. Rev. Stat. § 48-151 (Reissue 1993). The parties in this case stipulated that Nunn's accident occurred in the course of his employment, but Texaco denied that the accident *arose out of* his employment.

■ " 'The term "arising out of" describes the accident and its origin, cause, and character, i.e., whether it resulted from the risks arising from within the scope or sphere of the employee's job.' " *Nippert v. Shinn Farm Constr. Co.*, 223 Neb. 236, 237-38, 388 N.W.2d 820, 822 (1986). Appellate courts in this state have not squarely addressed the issue of whether one's injuries arise out of his or her employment where, due to an idiopathic condition, he or she blacks out while driving and is involved in an accident. While the Nebraska Supreme Court has addressed factually similar cases, it did not address this particular issue or declined to do so in such cases. See, *McGee v. Panhandle Technical Sys.*, 223 Neb. 56, 387 N.W.2d 709 (1986); *Swartz v. Hess, Inc.*, 188 Neb. 542, 198 N.W.2d 64 (1972).

The trial court in the present case applied the positional risk doctrine in determining whether Nunn's accident arose out of his employment. Under the positional risk doctrine, an employee's injuries arise out of his or her employment if, during the course of employment, he or she is reasonably required to be at a particular place at the time of the accident, and there meets with an accident. *Nippert, supra.* See *McGinn v. Douglas County Social Services Admin.*, 211 Neb. 72, 317 N.W.2d 764 (1982) (White, J., dissenting). Texaco claims that the court erred in applying the positional risk doctrine and that the court should have applied the "increased risk" doctrine instead.

Under the increased risk doctrine, a claimant's accident arises out of his or her employment if the claimant's employment duties expose him or her to a greater risk or hazard than that to which the general public in the area is exposed. *Nippert, supra*; *McGinn, supra*; *Crow v. The Americana Crop Hail Pool, Inc.*, 176 Neb. 260, 125 N.W.2d 691 (1964). The Nebraska Supreme Court has traditionally applied an increased

risk analysis in cases involving injuries resulting from the elements or "acts of God." See, *McGinn, supra*; *Ingram v. Bradley*, 183 Neb. 692, 163 N.W.2d 875 (1969); *Crow, supra*. Recently, however, the court abandoned the increased risk approach and adopted the positional risk approach in one such case, *Nippert, supra*.

In *Nippert*, the claimant sought compensation benefits for injuries he sustained when, while in the course of his employment, a tornado picked him up and hurled him to the ground. The court noted that the claimant's injuries would not be compensable under the increased risk test because the claimant was not exposed to a different hazard than others generally in the area where the injury occurred. However, after careful consideration, the court concluded that the positional risk analysis was the better rule to be applied. Employing the positional risk test, the court found that the claimant's injuries arose out of his employment.

In the present case, Texaco claims that the Supreme Court's application of the positional risk doctrine is limited to act-of-God cases and that the Workers' Compensation Court erred in applying the positional risk doctrine to this case. We note that the Supreme Court has not employed an analysis applying the positional risk test in any case that it has decided since *Nippert*. In addition, when faced with cases factually similar to the one presently before us, the clear majority of other jurisdictions have employed an increased risk rationale in determining whether an employee's injuries arose out of his employment. 1 Arthur Larson, The Law of Workmen's Compensation § 12.12 (1993). See, *Murray v. Associated Insurers Inc.*, 114 N.C. App. 506, 442 S.E.2d 370 (1994); *Nat. Health v. Indus. Claim Appeals Office*, 844 P.2d 1259 (Colo. App. 1992); *Bennett v. Wichita Fence Co.*, 16 Kan. App. 2d 458, 824 P.2d 1001 (1992); *Marshall v. Bob Kimmel Trucking*, 109 Or. App. 101, 817 P.2d 1346 (1991); *Aetna Finance Co. v. Bourgoin*, 252 Miss. 852, 174 So. 2d 495 (1965); *Allred v. Allred-Gardner, Inc.*, 253 N.C. 554, 117 S.E.2d 476 (1960); *Tapp v. Tapp*, 192 Tenn. 1, 236 S.W.2d 977 (1951).

Given the above, we are not led to an inescapable conclusion regarding whether the positional risk or increased risk analysis

should be applied in this case. Nonetheless, we need not make such a determination, as we find that Nunn's injuries are compensable under either doctrine.

Applying the positional risk doctrine, we find that Nunn's employment reasonably required him to be behind the wheel of a truck hauling thousands of gallons of crude oil at the time and place that he blacked out and experienced the accident resulting in his injuries.

Employing the increased risk doctrine, we also conclude that Nunn's injuries arose out of his employment, because his duties exposed him to a greater risk than that to which the public is exposed. Clearly, the consequences of blacking out behind the wheel of a truck carrying 8,000 to 10,000 gallons of oil are much more severe than the consequences of blacking out at home or while walking on the sidewalk.

Having concluded that Nunn's accident arose out of his employment, we reject Texaco's first assigned error.

*Credit for Short-Term Disability Payments.*

Texaco claims that the review panel erred in affirming the trial court's determination that Texaco was not permitted to credit payments made pursuant to its short-term disability plan against the workers' compensation award. Texaco bases its claim on language in the disability policy that provides that short-term disability benefits may be offset by workers' compensation benefits paid. The trial court found that Texaco was not entitled to credit for its payment of short-term disability benefits because Texaco denied liability for the injury. See *Anderson v. Cowger*, 158 Neb. 772, 65 N.W.2d 51 (1954). The review panel also found that Texaco was not entitled to such credit, but based its finding on Neb. Rev. Stat. §§ 48-130 and 48-147 (Reissue 1993).

Section 48-130 provides:

No savings or insurance of the injured employee or any contribution made by him or her to any benefit fund or protective association independent of the Nebraska Workers' Compensation Act shall be taken into consideration in determining the compensation to be paid thereunder; *nor shall benefits derived from any other*

> *source than those paid or caused to be paid by the employer as herein provided be considered in fixing compensation under such act.*

(Emphasis supplied.) Section 48-147 provides in part: "[L]iability for compensation under [the Workers' Compensation Act] *shall not be reduced or affected by any insurance of the injured employee, or any contribution or other benefit whatsoever,* due to or received by the person entitled to such . . . ." (Emphasis supplied.) These two provisions make it clear that the payment of private insurance benefits, even if made pursuant to an employer-funded plan, does not entitle an employer to reduce an employee's benefits due under the Workers' Compensation Act. Similar provisions are found in a majority of states' workers' compensation laws. See 4 Arthur Larson, The Law of Workmen's Compensation § 97.51(a) (1993). We understand and agree that a private insurance policy may provide that benefits *payable under the private insurance policy* can be offset by workers' compensation benefits paid. See *id.,* § 97.51(c). Such would be a contract issue. However, that is not the situation in this case. Rather, Texaco asks for a *reduction in compensation benefits* payable, which is prohibited by law. We find that the review panel committed no error in finding that Texaco was not entitled to credit for disability payments paid to Nunn.

## CONCLUSION

Having found no error in the review panel's determination that Nunn's accident and resulting injuries arose out of his employment with Texaco and that Texaco was not entitled to credit in the award for disability benefits paid to Nunn via an employer-funded disability plan, we affirm the review panel's decision.

Pursuant to Neb. Rev. Stat. § 48-125 (Reissue 1993), an award of attorney fees to Nunn is appropriate, and the same will be made upon the filing of a motion in compliance with Neb. Ct. R. of Prac. 9F (rev. 1992).

AFFIRMED.